[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-12165
Non-Argument Calendar
_____

D.C. Docket No. 8:13-cv-01784-WFJ-JSS

KENNETH PALMER,

Plaintiff-Appellant,

versus

ROBERT A. MCDONALD,
Department of Veterans Affairs,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 11, 2020)

Before MARTIN, ROSENBAUM, and BRANCH, Circuit Judges.

PER CURIAM:

The Rehabilitation Act of 1964 ("Rehabilitation Act") prohibits an entity that receives federal funds from "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business . . . ."  42 U.S.C. § 12112(b)(5)(A).[1]  This appeal concerns whether the Department of Veterans Affairs ("VA") violated the Rehabilitation Act by failing to make accommodations for an employee's short-term memory loss.  We conclude that the district court correctly granted summary judgment to the VA because no reasonable jury could find that such a violation occurred, and therefore affirm.

Kenneth Palmer quit his job as a veterans service representative at the VA in October 2012.  Thereafter, Palmer filed a lawsuit against the Secretary of the VA (the "Secretary")[2] pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and the Rehabilitation Act, asserting claims for: national origin

---

[1] The Rehabilitation Act expressly adopts the Americans with Disabilities Act's (ADA) provisions and standards for determining violations of the law.  29 U.S.C. § 794(d).   We therefore cite directly to the ADA and apply our precedents interpreting that statute.  *See Cash v. Smith*, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000) ("Cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa.").

[2] Palmer initially sued Eric Shinseki, the former VA Secretary.  Since the filing of this lawsuit, several individuals have held the post.  The current VA Secretary (and Appellee in this case) is Robert McDonald.  We refer to the Defendant/Appellee as the "VA."

2

discrimination (Count I), retaliation (Count II), disability discrimination and failure to reasonably accommodate a disability (Count III), hostile work environment harassment (Count IV), and injunctive relief (Count V). The district court dismissed Palmer's complaint with prejudice for failure to state a claim upon which relief could be granted.[3] On appeal, this Court affirmed the dismissal of Palmer's claims—for the most part. *Palmer v. McDonald*, 624 F. App'x 699, 701−05 (11th Cir. 2015). The panel affirmed the dismissal of Palmer's discrimination, retaliation, hostile work-environment, and constructive-discharge claims. *Id.* But it vacated the dismissal of his failure to accommodate claim under the Rehabilitation Act and remanded that claim for further proceedings. *Id.* at 705−06.

Palmer based his failure to accommodate claim on a number of alleged physical and mental impairments, including "a neck problem, back problems, acid reflux (GERD), chronic headaches, tinnitus, short-term memory loss, depression, mood disorder, mental issues, insomnia, sleep apnea, hypertension, [and] feet and knee problems." He alleged that his managers at the VA did not accommodate his disabilities because they: (1) did not allow him to take notes, (2) did not provide him additional the training he required, (3) ignored his request for a desk wrist pad,

---

[3] To be precise, the district court allowed Palmer to amend his complaint three times and dismissed Palmer's *third* amended complaint with prejudice.

and (4) did not provide him an ergonomic chair until months had passed since his request for one.

On remand, the district court granted the Secretary's motion for summary judgment on the merits of Palmer's claim that the VA did not accommodate his requests on account of his short-term memory loss for additional training and note taking. It held that Palmer did not establish that he had a qualifying disability and even if he did, he failed to show that the VA did not accommodate any requests to accommodate it. The district also determined that it lacked jurisdiction over Palmer's claims regarding the ergonomic chair and desk wrist pad because he failed to exhaust his administrative remedies regarding those claims.

Palmer argues that the district court erred in granting summary judgment to the Secretary as to his failure to reasonably accommodate a disability claim for additional training and the ability to take notes.[4] Assuming that Palmer suffered from a qualifying disability that required accommodations, nothing in the record shows that the VA denied him those accommodations. We therefore affirm the district court's grant of summary judgment to the VA.

I.

---

[4] Palmer does not challenge the district court's dismissal of his claims regarding the ergonomic chair and wrist pad for lack of jurisdiction.

In May 2010, Palmer started working for the VA as a veterans service representative at the VA regional office in Togus, Maine.[5]  After completing the weeks-long basic training, which covered the processing of regular veterans claims, he was assigned to work solely on what are known as *Nehmer* or "Agent Orange" claims.[6]  Pursuant to federal regulations, *Nehmer* claims are processed differently from regular ones.[7]  In June 2011, he transferred to the VA regional office in St. Petersburg, Florida, where he was assigned to the "PRE4 team,"[8]

---

[5] Palmer received a bachelor's degree in aviation management from Florida Tech.  He also received a master's degree in training and development online from Amberton University.

[6] One quick word on what Palmer's job "processing" *Nehmer* claims in Maine entailed. In Palmer's words, he would "grab a file, read it from the very first page to the last page, looking to see if you can find a claim that was missed in the past relating to Agent Orange, the new conditions under the [Agent Orange] program."  If he discovered that a claim had been missed, he would "send communication to the veteran."  Processing regular claims, in comparison, required Palmer to take the following steps: (1) identify what the veteran is requesting, (2) verify that the veteran has service, (3) determine what information is needed to complete the file based on the service requested, and (4) send a letter to the veteran seeking that information.

[7] In response to orders from the U.S. District Court for the Northern District of California in *Nehmer v. U.S. Department of Veterans Affairs*, the VA promulgated special rules for determining the effective date of claims for diseases that are (now) presumed to be caused by exposure to the herbicide Agent Orange.  *See Nehmer v. U.S. Veterans' Admin.*, 712 F. Supp. 1404 (N.D. Cal. 1989); *Nehmer v. U.S. Veterans' Admin.*, 32 F. Supp. 2d 1175 (N.D. Cal. 1999); *see* 38 C.F.R. § 3.816.  As a result of *Nehmer* litigation, the VA must review previously rejected claims to determine whether the claimant is eligible for retroactive benefits. *See* 38 C.F.R. § 3.816(d).

[8] "PRE4 Team" stands for Pre-decision Team Number Four.

which processed regular veterans claims.[9]  On October 20, 2012, Palmer resigned from the VA.

The disability underlying Palmer's claim is his alleged short-term memory loss.  Documentation of this disability in the record is lacking.  Here is what we have.  On January 27, 2011, while Palmer's transfer to Florida was pending, a VA clinical neuropsychologist evaluated Palmer.  The neuropsychologist concluded that Palmer "exhibited generalized, mild cognitive inefficiency," as well as "somewhat pronounced, selective weakness in the area of verbal memory."  The only other documentation in the record regarding Palmer's memory deficiencies is a questionnaire his doctor completed ("physician questionnaire") in September 2012, stating that he suffered from "poor concentration and memory loss."  (We will return to the physician questionnaire later.) Palmer testified that he does not receive treatment for short-term memory loss.

As outlined by the 2010 Reasonable Accommodation Handbook (the "handbook") and as testified to by Clarke—the St. Petersburg VA office Local Reasonable Accommodation Coordinator ("LRAC")—the VA has a process in place for making reasonable accommodations for disabled employees.  An employee kicks off that process by requesting a reasonable accommodation

---

[9] Palmer requested that the VA transfer him from Maine to Florida as a reasonable accommodation for an anticipated surgery and for orthopedic problems that were aggravated by Maine's cold climate and interfered with his job.

verbally or in writing.  An employee can submit such a request to his supervisor, a manager in his chain of command, or the LRAC, and is "encouraged to document [his] request" on a specified form.  It is the St. Petersburg regional office's policy that when an employee reports to his manager a disability that requires accommodation, the manager refers him to the LRAC.  And in order to process the accommodation request, the LRAC must determine that the employee has a covered disability.  The handbook advises that in certain situations, "[m]edical documentation may be required to make this determination."  On that point, it further states:

> When a disability or need for reasonable accommodation is not obvious or otherwise not already known to the VA, the LRAC may request that the employee or applicant submit appropriate medical documentation about the disability and his or her functional limitations within thirteen (13) days of the initial request.  This information may be obtained from an appropriate health care professional, such as a physician, social worker, or rehabilitation counselor. . . .
>
> If the information provided by the requestor or his or her health care professional is insufficient to enable an informed determination, additional information may be requested.  In this instance, the LRAC should explain to the requestor why the submitted documentation is insufficient, identify the information that is needed, and allow the requestor an opportunity to provide the information.

Finally, according to the handbook, "[p]rocessing timelines freeze from the time that medical documentation is requested to when it is received."

7

Palmer's failure to accommodate claim arises from the sixteen months he worked in the St. Petersburg regional office. And the resolution of his claim depends upon Palmer's communications regarding his accommodation request with other VA employees at that office during that time. Before we delve into those communications, here are the relevant employees at the VA Regional Office in St. Petersburg: Scott Piazza was Palmer's immediate supervisor and leader of the PRE4 team from the time Palmer arrived in St. Petersburg in June 2011 until October 2011; Timothy Wright was Palmer's immediate supervisor and leader of the PRE4 team from October 2011 to December 2011; Jean Morgan replaced Wright and was Palmer's immediate supervisor and the PRE4 team leader from December 2011, through the date Palmer left in October 2012; Sandra Smith was the veterans service center manager; Kerrie Witty was the regional office director, Bettie Bookhart was the equal employment office ("EEO") manager, and Bonnie Wax was the human resources manager. Finally, Tamanique ("Tammi") Clarke was the LRAC within the human resources department, whose role required her to "assist supervisors and management officials at all levels with processing requests for reasonable accommodation."

    1. 2011 Communications Relevant to Palmer's Asserted Accommodation Request

Palmer's requests for accommodations began with his October 4, 2011 e-mail (four months after his arrival at the St. Petersburg Office) to Smith[10]—the veterans service center manager—concerning the group of claims to which he had been assigned: "digit 62" claims.[11]  He told Smith that he had processed only *Nehmer* claims in Maine and "never had proper in-house training for regular" claims, such as digit 62 claims.  He informed Smith that the digit 62 claims consisted of over 600 pending claims that were "in the worst overall shape in the entire stream," and had an error rate of "at least 80%."  Because the claims were in such disarray, Palmer informed Smith that he worked overtime to meet his production requirements.  "Factor in my various service-connected disabilities (back pain, severe neck injuries, other) that conspire to make work and new learning a challenge," Palmer continued, "and you can understand my concern."  Palmer stated that "[e]ven with my disabilities and limited training, I have maintained an almost perfect record in reference to STAR errors. . . . [And] I have also discovered errors which have gone unperceived by entire review teams having much higher levels of training and experience than my own."  Nevertheless, Palmer explained that he was "really feeling pressured to attain daily production at

---

[10] Palmer testified that he discussed the contents of this e-mail with his immediate supervisor at the time—Piazza.  Palmer explained that Piazza helped him and he was not claiming that Piazza had denied him any training.

[11] Digit 62 claims are claims from veterans whose social security numbers end with "62."

all cost" and his "health [was] being affected by this situation." Therefore, Palmer suggested to Smith that "[i]t might be time for us to consider if some kind of accommodation can be made to help me continue maintaining the quality of work I have demonstrated to this point while also meeting St. Petersburg [Regional Office's] productivity expectations." [12]

On October 12, 2011, Wright—Palmer's immediate supervisor—e-mailed Palmer to follow up on a discussion between the two earlier that day concerning "training needs, workload management processes, production requirements on (CWS) compressed work schedule, and Reasonable Accommodation." [13] Wright confirmed that an issue regarding "access to mandatory training ha[d] been resolved," and Palmer "now had access to all training." Wright explained that he had reviewed the production requirements with Palmer and that he had given Palmer productivity tips. Wright told Palmer that he could come to Wright with questions or concerns, as well as receive one on one training within his team.

---

[12] Palmer testified that he mistakenly e-mailed Smith, thinking she was the regional office director. Nothing in the record indicates that Smith responded to this email.

[13] Palmer testified that during that one-on-one conversation, he told Wright that he had a disability and needed time to take notes when Wright gave him instructions, but Wright did not heed his request. Palmer admitted that Wright never told him that he could not take notes but alleged Wright said during meetings that "he was not going to repeat himself." Palmer also acknowledged that he had the same short-term memory disability when Piazza was his supervisor (Wright's predecessor), but he never asked Piazza for a similar note taking accommodation.

Wright reiterated that he would review the list Palmer "agreed to provide indicating [his] most immediate training needs." Finally, Wright indicated that Palmer "mentioned some issues that are medical in nature," and, therefore, Wright referred Palmer to "Tammi Clarke in HR so you can discuss your concerns and options available to you." In reply to Wright's email, Palmer thanked him and confirmed that he had requested a meeting with Clarke.

Palmer met with Clarke on October 13, 2011. According to Palmer, he and Clarke talked "for quite some time" about his short-term memory loss, as well as his back and wrist issues, but Clarke told him to obtain medical evidence for his disabilities and she was unable to "come up with any ideas on how to solve the memory problem." She suggested that Palmer use a tape recorder, but he told her that it was "something you cannot do in [the VA] environment." He also told her that what "works for [him] sometimes" is notating and highlighting documents and rereading them "until they stay." He told her that the constant "flux of e-mails" and "e-mails changing things even twice on the same day" was a problem for him, and Clarke "said [something] along the lines of, well, we'll have to see about that, how we can do something." In Palmer's own words, he requested three accommodations in that meeting: (1) an ergonomic chair; (2) a wrist band; and (3) an accommodation for his short-term memory problems. When asked what the

11

"specific accommodation" he requested for his memory problem, Palmer testified that "the accommodation[] was for HR to come up with."

Clarke testified that she recalled Palmer stating during the October meeting that "he needed a chair for his back issues and that he had trouble sleeping and had memory, some memory problems." She explained that they discussed possible accommodations such as a tape recorder and that they consulted an online network the VA used for reasonable accommodation devices, but "what we saw on there weren't things that he was interested in so he wanted to just talk about the chair." Clarke also testified that she suggested that Palmer take "additional breaks" but that he was not interested in that option. Clarke also explained to Palmer that in order for an accommodation to be approved, she would need medical documentation to support the request, and Palmer indicated he would provide this information.

At some point, Palmer also informed Clarke that Wright was preventing him from taking notes during meetings.[14] Clarke approached Wright about Palmer's accusation that Wright would not allow him to take notes and Wright denied the

---

[14] The parties dispute when the conversation about the note-taking issue occurred. Palmer testified that that he told Clarke during the October meeting that he needed time to write things down," but Wright did not "giv[e] [him] the time and opportunity" to do so, while Clarke testified that Palmer told her about the note-taking issue when he stopped her in the hallway sometime after the October meeting. The date on which the conversation occurred is not pertinent to the resolution of this appeal.

12

accusation.  After speaking with Wright, Clarke stopped by Palmer's desk to let him know that she had spoken to Wright, and that Wright said he never told Palmer that he could not take notes.  Palmer responded, "[w]ell, he doesn't let me take notes.  I can't take any notes."[15]  Clarke stated that she told Palmer that he could meet with her to discuss it further if he wanted to do so, but he did not come back to request a reasonable accommodation for taking notes.

On November 16, 2011, in accordance with the medical documentation request from Clarke, Palmer submitted a doctor's note, written on a prescription slip, stating that he needed an "orthopedic ergonomic chair for back pain" and "wrist support for [his computer] mouse."  In response to that note, on November 21, 2011, Bonnie Wax—the Human Resources manager—sent Palmer a letter, explaining that although he indicated that he had "some type of medical condition that may require an accommodation," the note he submitted did not provide "enough information to make a determination as to whether [he was] a 'qualified individual with a disability' as defined by the Rehabilitation Act and, if so, what type of accommodation [the VA] may be able to provide."[16]  Therefore, Wax

---

[15] Palmer explained in his deposition that what he was requesting was the time and opportunity to write things down during any and all meetings.  When asked what amount of time would have been sufficient, Palmer stated "whatever amount of time it takes me to write down notes about the information I'm getting and that makes sense to me."

[16] Clarke testified that the November 16 note was insufficient to process Palmer's accommodation request "[b]ecause it [didn't] answer all of the questions that would be on [the]

informed Palmer that, in order for HR to process his request, Palmer needed to

provide the following information from his health care provider:

1. Your precise medical diagnosis;
2. The severity of your medical condition and your prognosis for recovery;
3. Whether your condition (a) affects your ability to perform any life activity, and (b) if so, what life activities are affected and how they are affected;
4. Have your health care provider compare your medical restrictions with your current job functions and advise us what functions, if any, you are restricted in or unable to perform as a result of your medical condition, and explain why your medical condition restricts or prevents you from performing the particular job function;
5. For each job function listed in response to number 4 above, the health care professional must:
     a.   Explain how the job function can be modified to allow you to fully perform the function given
     b.   Provide specific medical restrictions
6. For each accommodation you request, the health care professional must explain why your medical condition requires such an accommodation.
7. We are also attaching a copy of your request for Accommodations dated November 16, 2011.  Please ask your healthcare professional to review each of the accommodations that you have requested.  For each accommodation you request, the health care professional must: (a) explain why your medical condition requires such an accommodation and (b) how it will assist you in meeting the production requirements of your position.

---

medical documentation request that we would send to the physician. . . it didn't have enough on it for us to make a determination.  It just said orthopedic ergonomic chair for lumbar back, lower-back pain and wrist support for mouse.  That's all it said.  But it doesn't state why, like what's the functional limitations . . . or what's limited by his disability."

14

Palmer was instructed to provide the medical documentation to HR within 15 business days. Wax stated that upon receipt of the information, "it [would] be promptly reviewed and a determination [would] be made as to whether your medical condition meets the Rehabilitation Act's definition of 'individual with a disability.'" The letter explained that if Palmer met the definition, then "[HR] will work with your supervisor(s) to determine what, if any, accommodation we can provide you." Finally, the letter indicated that a packet was enclosed for Palmer to take to his physician. Wax also provided Palmer with a packet for him to give to his doctor, which included a physician questionnaire for his doctor to fill out that included questions regarding each of the items about which Wax told Palmer he needed to provide further information.[17] The introduction to the questionnaire provided as follows:

> Kenneth Palmer has requested a reasonable accommodation. Enclosed please find a copy of the accommodation request(s), his current position description and/or his current performance standards. Although Mr. Palmer has indicated that he has some type of medical condition that may require an accommodation[,] we simply do not have enough information to make a determination as to whether he is a "qualified individual with a disability" as defined by the Rehabilitation Act and, if so, what type of accommodation we may be able to provide for Mr. Palmer.

---

[17] Palmer testified that Clarke was "incompetent" because she did not provide him the physician questionnaire when he first met with her, and as a result it took longer for the VA to process his request for an ergonomic chair. As outlined above, however, Clarke proceeded in accordance with the handbook and office policy.

Attached to the physician questionnaire was Palmer's previously submitted November 16 doctor's note.

Palmer submitted a completed physician questionnaire to HR on December 5, 2011 (the "2011 physician questionnaire"). The 2011 physician questionnaire states that Palmer's medical diagnosis was "degenerative disc disease," which substantially limits his ability to sit for prolonged periods, stand, walk, and lift things. His physician indicated that Palmer was "not limited to carry out any of his job duties as long as he is comfortable and takes breaks as needed." The physician indicated that Palmer's medical condition caused "pain and concentration deficit." In response to the question as to how Palmer's job function could be modified or what the VA could do to allow Palmer to fully perform, Palmer's physician indicated that the VA could provide an orthopedic chair and frequent breaks. Palmer's physician explained that those accommodations would "reduce pain [and] therefore improve concentration on job duties." The physician did not mention anything about memory loss or a short-term memory disability.

The VA processed these materials as a request for an ergonomic chair to reasonably accommodate Palmer's degenerative disk disease.[18] Less than two weeks after Palmer submitted the documentation later, on December 22, 2011, Witty—the director of the St. Petersburg VA regional office—approved Palmer's

---

[18] Palmer received the ergonomic chair in mid-January.

16

request for an ergonomic chair (the "2011 accommodation approval notice").  The 2011 accommodation approval notice informed Palmer that it was his responsibility to notify HR if his medical condition changed or if a "change in the accommodation [was] warranted."

Meanwhile, on December 7, 2011, Palmer sent an e-mail to Bookhart—the EEO Manger—listing complaints concerning Wright.  Palmer recapped his October conversation with Wright about his lack of training on regular claims and his medical issues and asserted that, even though Wright had offered to help Palmer, he had in fact frequently rebuffed him.  Palmer described several instances in which he believed that Wright had responded in a condescending tone to his questions and unnecessarily used all-caps in emails.  Palmer also complained that although he had "clearly advised" Wright that he needed "to take notes during any meetings in order to compensate for [his] short-term memory disability," Wright had "several times" given him "instructions in haste" without affording time to take notes.  Palmer stated that he believed Wright's intent was "to exacerbate my mood disorder and memory conditions since he already knows about my problem[s]."  Bookhart immediately responded, inviting Palmer to meet with her that very day to discuss his e-mail.  Palmer responded that he had been assigned an urgent case but would come see her as soon as possible.  Bookhart followed up the next day, informing Palmer that Wright's supervisor "has been made aware of [his]

17

concerns" and would be addressing the issues, and that she would keep Palmer informed.

Soon thereafter, on December 12, 2011, Jean Morgan replaced Wright as Palmer's supervisor and the PRE4 team leader.[19]  Nothing in the record indicates that Palmer complained about note-taking after Morgan replaced Wright.

2. 2012 Communications Relevant to Palmer's Asserted Accommodation Request

In January 2012, the VA implemented the Standard Notarized Letter ("SNL") system, which was intended to reduce the amount of typing required for service representatives, such as Palmer, to generate letters.[20]  All service representatives received the same training on the new system.

On July 12, 2012, Palmer sent Morgan an e-mail in which he complained about the quality of the SNL training, asserted that the new system was "in chaos," explained that he was having problems understanding and dealing with changes to the new system, and declared that the VA "has to take responsibility for providing the proper training."  He did not say anything about a disability.  Morgan

---

[19] Morgan testified that Palmer never told her that he was disabled and that she was unaware that he had any disabilities until she was asked to prepare a declaration for this case. Palmer testified, however, that he told Morgan that he had a short-term memory problem and needed to write things down.  He did not claim, however, that Morgan did not allow him that time, and acknowledged that his claim was based on Wright's conduct.

[20] When the VA implemented the SNL system, it "reorganized the digits," and, as a result, Palmer no longer had to work on digit 62 claims.

responded five days later.  While reminding Palmer that everyone on his team had the same training, she also identified three employees whom he could contact for additional training.

In approximately July or August 2012, Palmer advised Morgan that he needed additional training on SNL.  On August 9, 2012, at Palmer's request, Morgan arranged for Tiffany Vega, the Quality Review and Training ("QRT") Coordinator, to train Palmer one-on-one.  Vega stated that following that training, Palmer was able to perform tasks that he had previously been unable to perform. Palmer acknowledged that Vega trained him for eight hours, but, in his words, the training was "crap" and "didn't cut it."

On August 21, 2012, Palmer sent an e-mail to Witty—the regional office director—on which Smith, Morgan, and Clarke were copied.  He wrote that he was "[o]nce again . . .  request[ing] [an] accommodation for additional training under the American [sic] with Disabilities Act (ADA) for ancillary aspects of the new SNL process not covered in [his] recent SNL training."  He complained that he had "been mentioning [his] concerns about [his] lack of understanding with SNL . . . since early on this year when we completed the first SNL training, as well as my disability limitations precluding me from assimilating the new material," and "talked several times about how [his] memory issue made it challenging for [him] to learn the new . . . training with supervisors."  He continued:

19

The RO is well aware of my particular memory and learning issues based on my ADA accommodation request made last fall, among other [sic]. Even when my need for additional training as an accommodation was discussed multiple times, the RO failed to do so in a timely manner. I feel this is a violation of ADA policies as I was never given appropriate training needed because of my disabilities or proper time to adjust as necessary after any training was provided. I would like to have a proper evaluation of this issue and satisfactory response within the next three days.

Clarke responded about an hour and a half later. She said that she was a "little confused," that Palmer had stated that he was "once again" requesting additional training because this e-mail was the first time she had heard of this request. She stated that when they met last year, "we [only] talked about [his] need for a chair, wrist pads, and you mentioned a sleep disorder." And the documentation he submitted "only supported the need for an ergonomic chair, which was issued to [him]." She told Palmer that she would prepare another packet for him to submit to his physician to support his request.

In response to Clarke, Palmer wrote:

You should probably recall the one and only reason we talked about my sleep disorder issue was my memory issues and how these affected my learning at work, then we talked about a recorder which I mentioned cannot be used in our environment. In the end, we couldn't come up with a good idea, so we moved on to the back issue and about getting the chair.

I don't want you to get confused about this. I have brought up the memory issue several times to other persons – my supervisors – when the new [] process was announced around January of this year – i.e. this is after our meeting, and I'm not blaming you about anything.

20

Clarke forwarded this reply to Wax.

A few days later, on August 23, 2012, Director Witty responded to Palmer's

August 21, 2012 e-mail, in relevant part, as follows:

> In your previous e-mail to me you expressed concerns about SNL and
> in response to that e-mail, I asked Sandy Smith to respond to your
> concerns and she did. She asked if you felt you needed additional
> training on SNL to let her know and you responded that you would
> like additional training on SNL. Eight hours of additional, one on one
> training, was provided to you last week on SNL by a member of the
> QRT. When asked, you replied to [Morgan] that the training was very
> good. If you feel you need more additional training on SNL, please
> let your supervisor know and we will make arrangements for
> additional training.
>
> With regards to your assertion that you have a disability that requires
> an accommodation, my understanding is that you have never provided
> medical evidence to support you have a disability that results in
> memory problems that prevent you from being able to successfully
> perform the duties of your position. It is not obvious to anyone that
> you have a medical problem and certainly your ability to maintain a
> 98% accuracy rate would not make one question whether you had a
> medical problem. Regardless, in response to this e-mail, HR (Tammi
> Clarke) has advised you to stop by her office to pick up a Reasonable
> Accommodation packet so you can pursue your request for a [sic]
> accommodation based on your reported memory problems. Again,
> you will need to provide medical evidence to support your claim for
> accommodation.

In closing, Witty wrote:

> I want to state that your quality is great – you are already at the
> Secretary's goal of 98% [accuracy]. I appreciate your support and
> commitment to helping Veterans by maintaining such a high accuracy
> rate. The balance between production and quality can be challenging
> but I am confident you can strike the appropriate balance. To the
> extent that additional training will assist you, we can provide that
> upon request to your supervisor.

21

On August 27, 2012, Wax sent Palmer a letter regarding his August 21 e-mail. Wax noted that Palmer had asserted in his e-mail that he had a disability that results in memory problems and required an accommodation. She explained that although Palmer stated that he had requested a previous accommodation due to memory problems in November 2011, the office had not received medical documentation to support such a request.[21] Wax again explained the information and documentation Palmer would need to provide for the VA to process his accommodation request, and attached a copy of the physician questionnaire for Palmer's doctor to fill out. Like before, she asked Palmer to submit the medical documentation for review within 15 days of the letter.

The next day, Clarke e-mailed Palmer, thanking him for picking up his reasonable-accommodation packet. Clarke reminded Palmer that the agency could not move forward with his request until he submitted the medical documentation

---

[21] Wax provided more information regarding Palmer's 2011 accommodation request:

In November 2011, you met with Tammi Clarke, HR Specialist to discuss your medical needs. Specifically, you asserted a need for a chair, and wrist pads. You also mentioned a sleep disorder that you claimed caused memory and concentration problems. During the meeting you were informed that you must provide medical documentation to support requests for accommodation. The documentation you provided on December 19, 2011, only supported the need for an ergonomic chair. You received a copy of the Agency's approval of your accommodation request for an ergonomic chair on January 3, 2012. In that approval, you were reminded that it [is] your responsibility to notify Human Resources if your condition changes or if a change in the accommodation is warranted. The Agency did not receive further communication from you until your August 21, 2012 email.

"because we do not have enough information to make a determination as to whether you are a 'qualified individual with a disability' as defined by the Rehabilitation Act and, if so, what type of accommodation we may be able to provide for you."

Palmer submitted a completed physician questionnaire regarding his reasonable-accommodation request for additional training on September 10, 2012 (the "2012 physician questionnaire"). According to the 2012 physician questionnaire, Palmer suffered from various back problems, sleep apnea, poor concentration, and memory loss. The physician stated that these issues would "limit[] primarily memory issues," which means that "learning will take longer." His physician indicated that that Palmer needed an accommodation for the following reason: "Concentration diminished & learning processes secondary to constant musculoskeletal pain." The physician stated that an accommodation would help Palmer's job performance because "[a]ddition[al] time will increase performance."

On September 19, 2012, Clarke sent Palmer an e-mail stating that the VA had approved his reasonable-accommodation request for additional training (the "2012 accommodation approval notice"). The 2012 accommodation approval notice stated, in relevant part: "Please inform your supervisor of any additional

23

training that you need so that training sessions with QRT can be arranged for you. This training will be counted as excluded time."

On October 20, 2012, Palmer resigned from the VA and accepted a position as a claims examiner with the Department of Labor in Lakewood, Colorado. He filed this suit on July 10, 2013.

## II.

We review a district court's entry of summary judgment *de novo*. *Hallmark Developers, Inc. v. Fulton Cty.*, 466 F.3d 1276, 1283 (11th Cir. 2006). Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In determining whether there is a genuine dispute of material fact to defeat a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue of material fact exists where the dispute is over facts that might affect the outcome of the suit and where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010).

## III.

Under the Rehabilitation Act, an entity receiving federal funds—such as the VA—may not discriminate against an employee because of his disability. 29

24

U.S.C. § 791.  Discrimination against a disabled employee includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business."  42 U.S.C. § 12112(b)(5)(A). "Thus, an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the [Act] so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship."  *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007).

To state a claim for failure to accommodate under the Rehabilitation Act, the plaintiff must show that: (1) he is disabled; (2) he was a "qualified individual" at the relevant time, meaning he could perform the essential functions of his job with or without reasonable accommodations; and (3) the defendant discriminated against him by failing to provide a reasonable accommodation for his disability. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001).  "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions."  *Id.* at 1255–56.  We resolve this appeal on the third prong.[22]  Like the district court, we

---

[22] Because we resolve this claim under the third prong, we do not decide whether the district court erred in concluding that Palmer did not have a qualifying disability.

25

conclude that Palmer advanced no evidence establishing that the VA failed to accommodate his disability.

An employee does not trigger a federal agency's duty to provide a reasonable accommodation unless he makes a specific demand for one. *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020); *see also Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) ("We have previously held that a plaintiff cannot establish a claim under the Rehabilitation Act alleging that the defendant discriminated against him by failing to provide a reasonable accommodation unless he demanded such an accommodation."). An accommodation request must be "sufficiently direct and specific," it must "[a]t the least . . . explain how the accommodation requested is linked to some disability." *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001); *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009) (To trigger an employer's duty to provide a reasonable accommodation, the employee "must explain that the adjustment in working conditions or duties she is seeking is for a medical condition-related reason.").

An agency cannot be held liable for the failure to accommodate where "the employee is responsible for the breakdown of the interactive process."[23]

---

[23] Under the applicable regulations, where an employee has made a specific request for an accommodation, the agency in certain circumstances may need to engage in an interactive

26

*D'Onofrio*, 964 F.3d at 1022; *see also Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) ("Liability simply cannot arise under the ADA when an employer does not obstruct an informal interactive process; makes reasonable efforts to communicate with the employee and provide accommodations based on the information it possesses; and the employee's actions cause a breakdown in the interactive process."). "[W]hen the parties are 'missing information . . . that can only be provided by one of the parties, . . . the party withholding the information may be found to have obstructed the [interactive] process.'" *Jackson v. City of Chi.*, 414 F.3d 806, 813 (7th Cir. 2005) (quoting *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir. 1996)).

Palmer asserts that he put forth sufficient evidence to show that the VA denied his reasonable accommodation requests for (1) additional time to take notes and (2) additional training. We disagree.

A. Note-Taking Request

We begin with the note-taking request. As we read his complaint and briefs to this Court, Palmer claims that beginning in October 2011, he repeatedly

---

process with the employee to ascertain whether it is duty bound to provide an accommodation. See 29 C.F.R. 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. The process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."). The agency is required to provide a reasonable accommodation to a qualified individual, absent undue hardship. *Id.* § 1630.2(o)(4).

requested a note-taking accommodation because of his short-term memory disability and the VA failed to accommodate that request.  To trigger the VA's accommodation obligations, Palmer must have specifically demanded an accommodation, *see D'Onofrio*, 964 F.3d at 1022, meaning that he must have at least explained how his note-taking accommodation was linked to his memory disability.  *See Reed*, 244 F.3d at 261.  Palmer points to three instances where he requested that the VA provide a reasonable accommodation: his October 4, 2011 email to Smith, his October 12, 2011 discussion with Wright  (recapped in Wright's email), and his statements to Clarke during their meeting on October 13, 2011.

Even assuming those statements are sufficiently specific to trigger the VA's duty to engage in an interactive process to determine whether an accommodation was necessary, the VA did just that.  Clarke requested that Palmer obtain medical information to determine whether he had a disability or disabilities that required accommodation.  Palmer returned with a doctor's prescription for an ergonomic chair and a wrist pad.  But because that note was not sufficient to determine *why* he needed those accommodations (meaning how he was disabled), Wax gave Palmer a physician questionnaire for his doctor to fill out.  Palmer's physician completed the questionnaire but said nothing regarding a short-term memory disability and did not mention "note-taking" as an accommodation.  Instead, the physician stated

28

that Palmer's medical diagnosis was degenerative disc disease and that Palmer needed an ergonomic chair, which the VA provided.

At that point, Palmer was the only one who possessed the information necessary for the VA to provide him with a note-taking accommodation for his alleged short-term memory loss. And, to the extent that information existed, he withheld it, causing a breakdown in the interactive process. *See Jackson*, 414 F.3d at 813; *Stewart*, 117 F.3d at 1287.

Palmer argues, however, that the VA failed to accommodate his disability because his supervisor Wright refused to allow him additional time to take notes and Clarke was aware of this refusal. But as HR Manager Wax noted in her August 2012 e-mail to Palmer, Palmer failed to submit any medical documentation to support his short-term memory disability following his October 2011 meeting with Clarke. Furthermore, the record establishes that when Palmer told Clarke that Wright was not allowing him to take notes, Clarke investigated the matter by speaking with Wright. Clarke then informed Palmer that he was in fact allowed to take notes, and she also told Palmer that he could meet with her to discuss the matter further if he wanted to, but he never got back to her on this issue. In other words, Palmer failed to do his part by: (1) alerting the VA that the note-taking issue was linked to his short-term memory disability; (2) providing documentation of that disability; or (3) informing the VA that the note-taking issue was an

29

ongoing problem after Clarke spoke with Wright.  On this evidence, a jury could not hold the VA liable for failing to provide Palmer a note-taking accommodation. *Stewart*, 117 F.3d at 1287.

B. Training Request

We now turn to Palmer's training request.   Similar to his note-taking request, Palmer claims that he repeatedly requested a training accommodation because of his short-term memory disability beginning in October 2011 and the VA failed to accommodate that request.  Again, to trigger the VA's accommodation obligations, Palmer must have specifically demanded an accommodation, *see D'Onofrio*, 964 F.3d at 1022, meaning that he must have at least explained how his training accommodation was linked to his memory disability, *see Reed*, 244 F.3d at 261.

The record is clear that Palmer made a specific request for accommodation in the form of additional SNL training in August 2012, shortly before his resignation, and the record shows the VA approved the request after receiving the requested medical documentation.  Specifically, on August 21, 2012, Palmer e-mailed Witty to request an "accommodation for additional training" on the new SNL program and specifically mentioned his "disability limitations" and "memory issue."  Witty explained that Palmer had never provided evidence that he had a memory problem and that he should submit a physician questionnaire documenting

30

his need for additional training on account of a memory disability. On September 10, 2012, Palmer submitted the 2012 physician questionnaire, documenting his memory-loss disability and confirming that additional "learning time" would accommodate that disability. The VA approved his accommodation request for additional training four days later.

Palmer attempts to sidestep this clear evidence, arguing that although the VA agreed to provide him additional training on the new SNL system, the VA never provided him training on *regular* veterans claims, which he requested as early as October 2011. Again, prior to his August 2012 request, Palmer points to three instances where he requested that the VA provide a reasonable accommodation: his October 4, 2011 email to Smith, his October 12, 2011 discussion with Wright (recapped in Wright's email), and his statements to Clarke during their meeting on October 13, 2011.

Even assuming that he made a sufficiently specific request on the first two occasions to trigger the VA's duty to accommodate his memory disability by providing additional training, the VA did just that. In the October 4, 2011 email to Smith, Palmer stated that he never received adequate training for regular claims because up to that point he had focused on *Nehmer* claims. Shortly thereafter, Wright e-mailed Palmer to confirm, per their earlier conversation, that he "now ha[d] access to all training." Thus, according to the October 12, 2011 e-mail with

31

Wright, whatever issues Palmer had with training on regular veterans claims prior to his October 13, 2011 meeting with Clarke had been resolved by that time.

Finally, assuming Palmer made a reasonable request for a training accommodation on account of his memory disability during his October 13, 2011 meeting with Clarke, Palmer withheld the information necessary to accommodate that request by failing to provide medical documentation of the disability. *See Jackson*, 414 F.3d at 813. Therefore, just as with his note-taking request, the VA cannot be held liable for not addressing any alleged training request during that period.

Contrary to Palmer's assertions, the record shows that every time he mentioned needing additional training—regardless of whether he specifically tied it to his disability—the VA provided it. When he spoke to Wright about his need for additional regular training in October 2011, Wright made sure that he had "access to all training." Moreover, once Palmer provided the VA with documentation of his memory disability in September 2012, it approved his request for "additional training." And the 2012 accommodation approval notice generally gives Palmer the green light to receive "additional training"—it does not limit the training accommodation to SNL training. Therefore, the VA never denied Palmer a reasonable accommodation for *any* type of training.

32

In sum, nothing in the record shows that the VA denied Palmer's request to take notes or to receive additional training as an accommodation for his short-term memory loss.  As a result, a reasonable jury could not conclude that the VA discriminated against him in violation of the Rehabilitation Act.   We therefore affirm the district court's grant of summary judgment.

**AFFIRMED.**